Christian, J.
This case is before us upon a writ of error to a judgment of the District court of the fourth judicial district of Virginia, affirming a judgment of the Circuit court of Loudoun county.
It was an action of assumpsit, instituted by the Bank of the Old Dominion, located at Alexandria, against McVeigh, the defendant in error, for the amount of three notes, negotiable and payable at, and negotiated by the Bank of the Old Dominion at Alexandria. The first note was dated the 22d day of April, 1861, and was drawn for the sum of three hundred dollars. The second, drawn for the same amount, was dated the 8d day of May, 1861. The third note was drawn for the sum of one thousand eight hundred and seventy-six dollars and seventy-five cents, and was dated on the 4th day of June, 1861. Each of these notes was payable at ninety days, and they were not paid at maturity.
The defendant pleaded “non assumpsitand this was the only plea tendered. Issue was joined on this jilea, and the sole defence set up under it was, that on the eighteenth day of July, 1864, the defendant in error paid into the branch Bank of the Old Dominion, at Pearisburg, the amount of said notes in Confederate *461 States treasury notes. The authority relied upon by the defendant in error, for making this payment at the branch bank instead- of the parent bank, and in a depreciated currency, is an act of the General Assembly, sitting at Richmond, passed March 3d, 1864. The motion to exclude proof of this act from the jxuy, and the instructions asked for by the plaintiff in error, both raise the question, whether the defendant in error is discharged from his obligation to pay these notes, which, by the terms of his contract, are due to, and payable at, the Bank of the Old Dominion at Alexandria, by payment of Confederate treasury notes to the branch bank at Pearisburg. Or, in other words, whether it was competent for the Legislature, by the act of March 3d, 1864, to confer upon the defendant in eiTor authority to pay in such mode, and in such currency, at the branch bank, a debt due in gold at the parent bank. This is the sole qxxestion presented by the record for adjudication here.
The act referred to is in these words: “Be it enacted by the General Assembly, that it shall be lawful for any person, body politic or corporate, who may be indebted to any of the branch banks of this State, and unable, because of the presence of the public enemy, to dischai’ge said indebtedness at the office of said branch bank, to deposit in the mother bank thereof, if within the lines of the Confedei’ate armies, the amount represented to be due said branch bank, and the said mother bank is hereby authorized to receive, at its discretion, said amoxxnt, and give a receipt to the party paying the same; and such payment shall be held as a discharge, to the extent thereof, of said indebtedness.: provided, &c.: * * And provided, further, that the provisions of this act shall be applicable in case of any mother bank within the enemy’s lines; in which case such payment may be made to any branch thereof *462 within our lines, in like manner and with like effect an<^ limitations as are above provided.”
It cannot be maintained, as argued by the counsel ^or <lei'en(iant in error, that this act is a mere change of the charter of the Bank of the Old Dominion, made under the reserved power of the Legislature to alter and amend the charters of banking institutions. It neither proposed nor professed to change the charter of this bank, or of any other bank. There is nothing in the title, or in the body of the act, to disclose any such design. If such were its purpose and scope, it could only affect contracts thereafter made, and could in no wise change or alter contracts already entered into, so.as to affect the rights of parties already acquired under them.
The act in question does more than simply to authorize a debtor to the mother bank to pay his debt at one of its branches. It is doubtful whether it would be competent for the Legislature even to do that, as to debts already contracted payable at the mother bank. It goes, however, far beyond this, and according to the theory of the defendant in error, and the construction given to it in the court below, it authorizes payment of a debt due to and payable at the mother bank, to an agent, not of its own appointment, but appointed by the Legislature, and in a currency, not in gold or its equivalent, as the contract requires, but in that which-amounts in value to less than one-twentieth part of the debt, and this, too, without the knowledge or consent of the plaintiff. This must be the scope and effect of the act to sustain the defence relied upon. It is admitted that the payment was made by the defendant in Confederate treasury notes in 1864, when at a great depreciation. It mil not avail him now to uphold the validity of that act, upon the ground that it does not, in terms, authorize payment in Confederate money. If it did not, then the payment in Confederate funds *463 was not a compliance witli the act, and the debt was not discharged. If it did, then the act attempted to make Confederate money a legal tender, and was, for that reason, unconstitutional and void.
But it is said that the act in question only authorized the branch bank to receive, at its discretion, the indebtedness of creditors, to the parent bank; and it was for the branch bank to determine what kind of currency it would accept in payment; and that having accepted Confederate money, it was a good payment in discharge of that indebtedness. But such an argument is based upon the assumption that the branch bank was the legally authorized agent of the parent bank, with authority to collect its debts in a depreciated currency. Where and how was such an agency created, or such authority conferred? Outside of the act in question, there is no law or usage which constitutes any branch bank an agent to collect debts due to the mother bank, except when sent to such bank for collection. Bor all purposes of banking and trading, the mother and branch banks are distinct and independent. The one is in no sense the agent of the other. The bank charters and the provisions of the Code regulating their operations, as well as the universal usage of the banks, shew this. It must, therefore, be conceded that if the deposit of Confederate treasury notes in the branch bank at Pearisburg operated as a payment, discharge or satisfaction of the debt due from McYeigh, it was not by virtue of any authority, express or implied, or by the agreement or consent of the plaintiff, but only by the compulsory force of the act of March 3d, 1864, above referred to.
It becomes necessary, then, to consider the effect and validity of that act, and to enquire whether it was consistent with those constitutional limitations and prohibitions which impose a wise and beneficent restraint upon the legislative power?
*464 This act, in effect, first creates an agent, for the creditor, without its knowledge or consent, and then authorizes that agent, thus created, to receive, at the a3mi’s discretion, against the consent of the principal, whatever currency the agent may choose to receive in payment of debts due to the principal; and in terms declares, that such payment shall be in satisfaction of' the debt. So that under this statute, if a debtor of' the mother bank, situated as this bank was, made a deposit in a branch bank, which that bank chose to receive, of worthless paper money, it must be held to be in satisfaction of the debt due to the mother bank, although that debt was payable in gold, and although the deposit of the worthless paper is made in the branch bank, without the knowledge or consent of the mother bank. And this is precisely the case made by the record. McVeigh’s contract was to pay in legal currency to the Bank of the Old Dominion, at Alexandria. Under this act, according to the construction of the court below, he ivas permitted to pay, in discharge of his obligation, a currency depreciated to the extent of at least twenty to one, not at the place where, or to the creditor to whom he contracted to pay, but at a different place, and to an agent not authorized to receive it by his creditors.
I am considering the act in question, now, according to the construction that has been put upon it by the court below, and upon which alone the defendant? is entitled to a judgment in his favor. If this be the true construction of the act, then it is difficult to conceive how any law could be framed which more plainly and palpably violates that provision of the constitution of the United States which declares that no State shall pass “ any law impairing the obligation of a contract.”'
What is the obligation of a contract, in the sense in which it is used in the constitution ? It may be defined to be whatever the law of the State, where the *465 contract is made, binds a party to perform, under tbe terms of bis contract, express and implied. “ Tbe obligation of a contract ” (in the language of Judge Baldwin, in McCracken v. Hayward, 2 How. U. S. R. 612), “ consists in its binding force on tbe party who makes it. Tbis depends on tbe laws in existence when it is made; these are necessarily referred to in all contracts, and forming a part of them, as tbe measure of tbe obligation to perform them by tbe one party, and tbe right acquired by tbe other. There can be no standard by which to ascertain tbe extent of either, than that which tbe terms of tbe contract indicate, according to their settled legal meaning. "When it becomes consummated, tbe law defines tbe duty and tbe right; compels one party to perform tbe thing contracted for, and gives tbe other a right to enforce tbe performance by tbe remedies then in force. If any subsequent law affect to diminish tbe duty, or impair tbe right, it necessarily bears on tbe obligation of tbe contract, in favor of tbe one party, to tbe injury of tbe other; hence, any law which in its operation amounts to a denial, or obstruction, of tbe rights accruing by a contract, though professing to act only on tbe remedy, is directly obnoxious to tbe prohibition of tbe constitution.”
In Green v. Biddle, 8 Wheat R. 1, Mr. Justice Washington, delivering the opinion of tbe court, says: “Any deviation (from tbe terms of tbe contract) by postponing or aecellerating tbe period of performance which it prescribes, imposing conditions not expressed in tbe contract, or dispensing with tbe performance of those which are, however minute or apparently immaterial in their effect upon tbe contract of tbe parties, impairs its obligation.” In Bronson v. Kinzie, 1 How. U. S. R. 311, one of tbe judges uses tbis language:. “A State Legislature cannot impair tbe contract by changing tbe time and manner of its performance. By tbe contract, *466 the parties, have- fixed their rights and obligations, and these are guarded by the constitution.” See also Sturges v. Crowningshield, 4 Wheat R. 122; Fletcher v. Peck, 6 Cranch. R. 87; Woodruff v. Trapnall, 10 How. U. S. R. 190; 1 Wall. U. S. R. 206; Taylor v. Stearns, 18 Gratt. 244.
Let us apply these familiar and well-settled principles to the case at bar. The defendant in error had given his promissory note to pay certain sums of money, on or before a certain day, to the plaintiffs, at the Bank of the Old Dominion at Alexandria. His contract was to pay in legal currency, in gold and silver or its equivalent; and to pay the same to the plaintiffs at their banking house in Alexandria. How, any law which changes the terms of this contract, or releases a part of its obligation, must, in the literal sense of the word, impair it. The Legislature, by the act in question, not only changed the terms of the contract, by authorizing payment to an agent of its own creation, and at a different place, but in effect released the defendant from nineteen-twentieths of the amount of his obligation. It would seem that the very statement of the proposition is sufficient to show that such an act of the Legislature must be at once condemned as unconstitutional and void. But it is gravely argued that the authority of the Legislature to f>ass the act in question is found in the fifty-third section of chapter 58 of Code of 1860, by which the Legislature reserved to itself “the right to repeal, alter or modify, the charter of any bank at its pleasure.” It is undoubtedly true that it is in the power of the Legislature, under its reserved rights, to alter or amend the charters of banking institutions, or to take them away altogether. But it does not follow that in doing this it may interfere with and abrogate contracts lawfully made under such charters, or disturb rights already legally vested under them in the course of its legitimate business.
*467 The Legislature did reserve, the right to modify and •amend the charter of the Bank of the Old Dominion; but it did not and could not reserve the right to alter ■contracts made under the old charter. All contracts made in pursuance of its charter are to be construed with reference to the charter in force at the time they were made. The charter may be changed, but the contracts made under that charter cannot be altered by the Legislature.
In Fletcher v. Peck, 6 Cranch’s R. 87, Ch. J. Marshall, delivering the opinion of the court, says: “The •principle asserted is, that one legislature is competent 'to repeal any act which a former legislature was competent to pass; and that one legislature cannot abridge the powers of a succeeding legislature. The correctness of this principle, so far as respects general legislation, can never be contravened. But if an act be done under a law, a succeeding legislature cannot undo it. The past cannot be recalled by the most absolute power.” See also Woodruff v. Trapnall, 10 How. U. S. R. 190. In a very recent case, Chicago v. Sheldon, 9 Wall. U. S. R. 50, 55, the court says: “A contract having been entered into between the parties, valid at the time by the laws of the State, it is not competent even for its legislature to pass an act impairing its obligations.”
But the act in question does not profess to be, and is not in fact, an act to “alter or modify” the charter •of the Bank of the Old Dominion, or of any other bank. It is, according to its title, “ an act authorizing banks or branch banks, in certain cases, to receive payment of debts payable at branch or mother banks ■within the enemy’s lines.” It was passed March 3rd, 1864. It is true the act does not, in terms, authorize such payment in Confederate money; but it is notorious, and is a part of the current public history of the times, that the only currency of the country, within. *468 the lines of the Confederate armies, was Confederate' treasury notes, and it is equally a part of the current public history that such currency was greatly depreciated at that time. In point of fact (as the record discloses), the amount paid by the defendant in error, and. received by the branch bank at Pearisburg, was paid and received in Confederate money. And the act in question ivas relied upon by the defendant’s counsel,, and by the court below, as authority for receiving such currency.
As before stated, this act either authorized the payment in Confederate currency, or it authorized the payment in legal currency. If the authority was to pay in legal currency, then the defendant in error has not complied with the requirements of the act; and if the act (as construed by the court below) authorized the-payment of the debt in Confederate currency, which was contracted to be paid in gold or its equivalent, then it is clearly unconstitutional and void, because it is an attempt to make a worthless currency a legal tender.. In either or any view of the case, the debt has not been, discharged, but is still due and unpaid.
IJpon the authority of a case recently decided in this, court (Alley et al. v. Rogers, 19 Gratt. 866), the payment to the Bank at Pearisburg was a void payment, and the-notes of the defendant in error are still due and unpaid,, the payment to said branch bank being without the consent of the plaintiff, and without the authority of law. I am therefore of opinion that the judgments of the District court and of the Circuit court of Loudoun must both be reversed.
Anderson, J.
The Bank of the Old Dominion was; incorporated by an act of the Legislature of Virginia,, passed March- 29th, 1861, subject to the right of the Legislature “ to repeal, alter or modify the charter, at its pleasure.” The defendant in error, who is also de *469 •fendant in the court below, in 1861, made three notes, payable at 90 days, at the Bank of the Old Dominion, in Alexandria, dated respectively April 22d, May 3d, - and June 4th, upon which this suit was brought in the Circuit court of Loudoun. In' support of the issue on his part, the defendant relied upon the payment of the notes to the branch of the Bank of the Old Dominion, at Pearisburg, under the act of Assembly, of March •3d, 1864. There was a verdict and judgment for the defendant. The whole case turns upon the validity of 'that act of Assembly, which we will now consider.
It provides that any person “ who may be indebted to any of the branch banks of this State, and unable, because of the presence of the public enemy, to discharge said indebtedness at the office of said branch bank, to deposit in the mother bank thereof, if within the lines of the Confederate armies, the amount represented to be due said branch bank; and the said mother hank is authorized to receive, at its discretion, said amount, and give a receipt to the party paying the same; and said payment shall be held as a discharge, to the extent thereof of said indebtedness: provided, that such payment shall operate as a discharge in no case in which such debt has been bona fide transferred, for value, to any loyal citizen of any one ■of the Confederate States, at any time prior to the date of such payment: and provided further, that the provisions of this act shall be applicable, in the ease of any mother bank within the enemy’s lines; in which •case such payment may be made to any branch thereof within our lines, in like manner and with like effect and limitations as are above provided.”
It is contended by some of the plaintiff’s counsel, that the latter clause, upon which the defendant relies, is a proviso ; and that a proviso cannot enlarge the operation of an act. This clause is very inartificially •drawn; but, I think, is not in fact a proviso. The *470 words, “ and provided further,” should he read, and it » provided further; equivalent to, “it is further enacted.” The word provided is used in the same sense that it evidently imports as the last word in the sentence.
' I am also of opinion, that it was plainly the intention of the Legislature, if the mother hank was within the enemy’s lines, to make lawful a payment to the-branch hank within the Confederate lines, by any person who was indebted to the mother hank: provided, the debt had not been bona fide transferred, for value,.' to a loyal citizen of any one of the Confederate States,, before payment; and to authorize the branch hank to-receive payment, at its discretion, and to give a receipt to the party paying the same. I do not think that it can he fairly construed, as giving the discretion to receive it to the mother hank; as construed by the plaintiff’s counsel. It would have been as impracticable to-have appealed to the discretion of the mother hank, as: to have made payment to it, in the case supposed by the act, and for which alone it is intended to provide,, when payment could not he made, “because of the-presence of the public enemy.” Such a construction, would render this clause of the act wholly nugatory. It was evidently, it seems to me, the intention of the Legislature to authorize jiayment of debts contracted with the mother hank, when cut off by the public-enemy, just as had been provided for payment of indebtedness to the branch hank, when placed in like-circumstances. It was obviously the policy and purpose of the Legislature, by this enactment, to enable the citizens of the Commonwealth to pay their indebtedness to the hanks of the Commonwealth, and the hanks to receive payment, as far as practicable, just as-would have been done if there had been no interference of the enemy. Hence, it is provided, that if the debt had been transferred to a loyal citizen of any one: *471 of tlie Confederate States before payment, it should not be made to the bank. Because, in such case, payment could be made to the holder of the note.
It seems to me, that the policy and purpose of the Legislature, under the circumstances, was wise and just. It is shown by the record in this case, that on the 24th of May, 1861, the Federal army took possession of the city of Alexandria, and held it until the close of the war. That, in October, 1862, the banking-house of the plaintiff was seized and occupied, and so continued to be, by the military of the United States, until the close of the war. That meetings of a bare quorum of the board had been held in Alexandria, after May 1861, until May 1863, sometimes at long intervals—in one case of ten months—but not for regular, or new business, and that, after May 1863, no meeting of said board was held until September 1865; and that, by the death of a member of the board, there never was a quorum in Alexandria from October, 1863, until after the close of the war. Thus is the non-payment of these notes at maturity, or afterwards at Alexandria, accounted for. It was not because of the unwillingness or inability of the debtor to pay; nor because of the unwillingness of the bank to receive payment, but because of the presence of the enemy in force, which prevented it. "We have no reason to believe that these debts would not have been paid at maturity had there been no interference of the enemy to prevent it.
"When the act of Assembly of March 3d, 1864, was passed, there was no board of directors of the Bank of the Old Dominion at Alexandria. It had become extinct, or its existence was suspended. But the corporation still existed. It never for one moment ceased to exist, and it existed alone in Virginia, and could exist no where else beyond the limits of her jurisdiction and sovereignty. And its corporators must be pre *472 sumed to be citizens of Virginia. We have here presented' the anomaly of a body corporate without a head, if the board at Alexandria was its head: and without a representative or agent, unless the branch bank at Pearisburg was its representative and agent. This branch of the Bank of the Old Dominion was established by the act of March 15th, 1856, which provides that it shall be under the direction of seven directors, to be appointed, and to have the same powers, and to be subject to the charter provided by law, in respect to the Bank of the Old Dominion, and to such other laws as may now be, or hereafter, passed in respect to said bank. And the general law provides, that any process or notice against a bank, if the case be against a bank of circulation, and be in a county or corporation, wherein the bank has a branch, service on the president or cashier of such branch bank shall be sufficient. (Code of 1860, eh. 170, sec. 7, p. 707.) This is in a case where the proceeding is against the corporation: thus recognizing the branch bank as the' representative of the corporation. We have seen that the branch bank of the Bank of the Old Dominion was under the direction of seven directors, who were to be appointed as the directors of the mother bank were appointed, and were to have the same powers, and to be subject to the charter of the Bank of the Old Dominion, and to such other laws as were then in force, or as might thereafter be enacted in respect to said bank: and this act of 1864 was one of them. The directors were all stockholders in the Bank of the Old Dominion, and had a like interest with the directors at Alexandria, in all the debts due the bank, whether contracted with the directors at Alexandria or at Pearisburg.
The act of March 3d, 1864, authorized this branch bank, so constituted, and the only representative of this corporation then existing, at its discretion, to re *473 ceive payment of the debts contracted with tbe Alexandria board. They were the debts due tbe same corporation, of which the branch bank was tbe agency; the only agent and representative of tbe bank within tbe jurisdiction of tbe State, where alone tbe corporation itself bad or could have any existence.
It seems to me, therefore, under these circumstances it was eminently proper for tbe Legislature, if it bad tbe power, to authorize payment to be made to this branch bank of debts contracted with tbe board in Alexandria, if tbe branch bank was willing, as tbe only representative and agent of tbe corporation, to receive it; thus to place tbe debtor and creditor in tbe same relative situation to each other, that they would have occupied if there bad been no interference of tbe public enemy. Tbe debtors were ready and anxious to pay, and tbe agency of the bank with whom the debts were contracted, we may well presume, would ■also have been entirely willing to have received payment, if they could have acted, in tbe same currency which was receivable and payable in all tbe other banks of tbe Commonwealth. Tbe debtor, by paying, or tbe creditor by receiving, was guilty of no infraction of tbe laws of tbe State, or of the Confederate States, or of tbe United States^ For tbe creditor was not an alien enemy, and could not be as a Virginia" corporation. And there was, consequently, no suspension of tbe debt by tbe war. And there is no good reason why tbe presence of tbe enemy in force, incapacitating one agency of tbe corporation to receive payment, or rendering it impracticable for tbe debtor to make payment to that agency, should cause tbe suspension of tbe debt if' there was another agency to whom it could be paid,' who was willing to receive it.
But it is argued, that there was no justice in allowing this debtor, who bad contracted bis debts in good money, to discharge them in a depreciated currency. *474 Where was the justice in not allowing the debtor to- « ^ Pay his debts at maturity, according to his contract, when the money was not depreciated, and require him it up until it had become greatly depreciated,. and then refuse to receive it? Or where is the justice in receiving it and holding it until it became worthless, and then to throw the whole loss on him, and require him to pay it over again, with an accumulation of interest, when money is worth four or five times as much as it was at the time the debt was contracted, estimating its value by the rate of interest it will command.
That the plaintiff has been a loser by the settlement which has been made of this transaction, all will admit. And it is one of the evils of the war, in which all have had to share, however unequally. There are few who have not suffered. Many have been reduced from affluence to indigence. Many who were surrounded with all the comforts of life in their own happy homes are now homeless and houseless. These evils, which are the result of a disastrous war, are irremediable. And worse than vain and fruitless would it be for the courts to undertake to remove them. We cannot disturb and overturn adjustments which they themselves have made. If the war had resulted in our favor, our condition would have been very different; and the loss of this plaintiff would probably have been inconsiderable.
To have a right view of the case, we must transfer ourselves to the situation of these parties at the time the transaction occurred, surrounded by the circumstances which surrounded them. Then the country was hopeful. Those who had gloomy apprehensions were regarded as croakers. And the directors of a bank might have calculated that it would be better to receive payment of a debt in a then depreciated currency, and employ the money in banking, than to have *475 the cleht suspended, and run the risk of losing it altogether. That if the war resulted in our favor the Confederacy would be the richest and most prosperous country on earth; and the debt of the war, in which the whole population were interested, would be paid, and the faith of the Confederacy redeemed. I need only say that the prospective view of the situation then, was very different from the retrospective now.
The matter was adjusted then, and if by competent parties, it is most reasonable that it should stand, as is expressly required by act of March 3d, 1866. The argument grounded upon the inadequacy of the payment in Confederate money, is as applicable to the payments made to all the other banks of the Commonwealth, if the branch bank at Pearisburg was legally authorized to receive payment. And it is a fact, which may be judicially known, that they received payment of their debts in Confederate money down to the close of the war. If, therefore, the payment made in this instance to the branch bank at Pearisburg was invalid, upon the ground of the depreciation of the Confederate currency, with which payment was made, then are all the payments received by the banks of this Commonwealth, in Confederate currency, after it became as much depreciated, invalid and void, and the liabilities to the banks are not thereby discharged. This is so if the act of March 3d, 1864, is valid, and the payments are annulled upon the ground of their inadequacy.
But it is argued that said act is invalid, because it impairs the obligation of contracts, within the prohibitory clause of the constitution of the United States. It seems now to be a well-established principle, by repeated decisions, that where the Legislature, in the act of incorporation, or by the general law, reserves the power “to repeal, alter or modify, the charter at its pleasure,” as is the ease here, such express reservation is regarded as a constituent part of the contract} and *476 every subsequent change made in the charter, by act of fLe Legislature is regarded as made with the consent of corporation, and does not come within the prohibit017 °lause °f the constitution.
In. the case of the Northern Railroad Co. v. Miller, 10 Barb. R. 260, the court says, referring to the principle decided in Dartmouth College v. Woodward, that “it is only applicable to charters where a right to repeal them has not been reserved in the original grant.” “It was competent for the State, having the power to grant or to withhold the charter, to annex such condition to the grant, or to make such reservation, as it pleased. The directors, trustees, or other managing agents, by whatever names they are called, by accepting the charter became bound by the condition or reservation, and every individual who subscribes to the stock of the company thereby makes himself a party to the contract, subject-to the conditions and reservations of the charter. In effect he stipulates, at the time he subscribes, that the Legislature may alter or repeal the law, and thus change the obligation of his subscription, or defeat it altogether. It cannot, therefore, be said that the amendatory act, which is complained of in this case, was an alteration of the defendant’s contract without his assent.” Again: “"Whatever modification is thus effected in the obligation created by his subscription is made by his own agreement, entered into at the moment he became a party to the contract, and is as "binding on him as if it had been accomplished by his •own solicitation and procurement.”
In the case of the Schenectady and Saratoga Plank Road Co. v. Thatcher, 1 Kern. R. 102, 114, Johnson J. says: “ The persons who contract to take shares in a company, under such an act, contract subject to the «ame reservation of power. The courts are bound to read their agreement with the legislative condition. ’They agree to take and pay for the shares for which *477 they subscribe, subject to the power of the Legislature to alter or repeal the charter of the company, and it does not lie in their mouth to complain that the power has been exercised.” And again: “The corporate property is subject to that jjower by reason of the assent to its exercise.”
In McLaren v. Pennington, 1 Paige R. 102, the Chancellor says: “It is not pretended that there is anything in the constitution of New Jersey or of the United States, which prohibits the reservation of such a power in a legislative grant. On the contrary, the insolvent laws of the States have been sustained, on the principle that a general law of the State where the contract was made, and which was in force at the making of such contract, is to be taken as a part of the contract.”
In the case of the City of Roxbury v. The Boston and Providence Railroad Corporation, 6 Cush. R. 424, C. J. Shaw, delivering the opinion of the court, says: “If this act adds anything, or makes more explicit the duty imposed by the act of incorporation, it affects the remedy only, and perhaps would be within the competency of the Legislature, without any reservation of the power of amendment; but if otherwise, it was fully warranted by the reservation by the statute of 1880, ch. 81.”
In the case of the State, Jersey City, and Bergen R. R. Co. v. Mayor, &c., of Jersey City, 31 N. Jersey L. R. 579, the charter provides the annual taxation which the company shall be subject to pay, and provides “that no other tax or impost shall be levied or assessed,” and the company in this case sets it up as a contract against the right of the Legislature to impose additional taxes. Rut the C. Justice, delivering the opinion of the court,, says: “ These statutory provisions form, in my opinion, a contract neither in letter nor in spirit. They are to be read in connection with that other provision in this. *478 charter, which reserves to the Legislature the right to alter, modify or repeal it.”
The same principle was directly involved, and decided by this court, in the recent ease of Anderson v. The Commonwealth, 18 Gratt. 295. In that case, the act incorporating the national Express and Transportation Company was passed December 12th, 1865, and was an amendment and reenactment of the act passed in 1861. It omitted the clause in the original act which attached a personal liability to the stockholders. Under this charter, the stock was subscribed, the company was immediately organized, and it seems were doing business by the 1st of January, 1866. Dy the legal effect of the charter, the stockholders were not liable personally for the debts and liabilities of the company; which was doubtless an influential consideration with those who subscribed for stock.
Some six weeks after the stock was subscribed, and the company commenced business, to wit: on the 15th of February, 1866, the general assessment law was passed, which spreads over thirty odd pages, and contains ninety-seven sections; and in the 93d section there was inserted a clause, which makes the stockholders of said company personally liable, jointly and severally, for the taxes to be assessed upon the company, and for heavy penalties, should they be incurred by the company. There is nothing in the title to indicate that it contained any modification of the said charter.
In 1867, the said Anderson was served with notice, by the auditor of public accounts, that on the 12th of February, 1867, he would move the Circuit court of the-city of Richmond for a judgment against him for $516 72, being one per cent, of the gross receipts of the Rational E. and T. Co. for doing business in this State from the 1st of January, 1866, to the 1st of September *479 •of the same year, clue from the company for taxes on their business, and for which the defendant was alleged to be liable as a stockholder in the company.
In that case the act, as we have seen, which imposed the personal liability on the stockholders, contrary to their rights under the charter, did not profess to alter or amend the charter, or to he enacted in reference to it; a point to which so much importance is attached in this case. But the change was made in a way least likely to give notice to the stockholders; and the letter of the plaintiff in error in that case, which was relied upon by the court as furnishing the only evidence in the record that he was a stockholder, shows as clearly, at least, that he was not aware of this change in the law, affecting his liability, when the notice was served upon him, twelve months after the law was passed. Yet in that case, the point so relied upon in this was raised and strongly urged. On p. 300, J. Joynes, who delivered the opinion in that case, in which the other judges concurred, says: “In the case in 26 Maine, the objection was taken, as it was in this case, that the reserved power of amendment must he exercised by a special act for that purpose; and that the liability of the stockholders could not be altered by a general law; hut it did not prevail.” And this objection was overruled.
If it were an original question, and not a res judicata, I should not be willing to go as far as the court did in that case. It does appear to be reasonable, that when the Legislature exercises its reserved power to modify or amend a charter, there ought to he some reference to the subject, and in the title to the act to show that the subject of alteration was in the mind of the Legislature, and that it was knowingly and intentionally modifying the charter, and that the stockholders have presumptive notice by the act, of the modification of their charter. So far as the decision in that case is in *480 conflict with this principle, I would concur with my brethren in the opinion that it is erroneous.
But in this case, the subject matter of the act of Assembly was the bank charters of the Commonwealth,. and the professed object was to confer powers on the branches, which it may be implied were not, in the-opinion of the Legislature, conferred by their charters. The title of the act, and the body of it, show unmistakably that it was the intention of the Legislature to modify the charters, both as to the powers of the mother banks in relation to the branches, and of the branches, in relation to the parent bank. In this case it is evident that the subject of the bank charters was in the mind of the Legislature, and it was its intention that the banks and their branches should have the powers therein expressed, whether its act should be regarded as a legislative construction or modification of their charters. I am of opinion, therefore, that both on principle and authority, there is no ground for the objection in this case that the act of assembly is general,, or does not profess to modify the charter of the bank..
But to return to the main question, whether this act of assembly of 1864, was a violation of contract, &c., J. Joynes says, in the case cited, p. 299, “It was further contended, that the imposition of such a personal liability on the stockholders, when the legal effect of the charter was to exempt them from any personal liability for debts of the company, was a violation of the-contract between the stockholders and the State. By the last clause of the charter it was made subject to modification or repeal, at the pleasure of the General Assembly. The stockholders, by accepting the charter, assented to that reservation as a constituent part of their contract.” And this opinion, we have seen, is supported by the highest authority, and may be regarded as a well established principle.
But it is contended, that where the company, in the *481 exercise of its chartered privileges, has entered into contracts, and acquired rights by its lawful acts, as the law then stood, no subsequent alteration of the charter by act of the Legislature, can avoid the contracts or divest the rights so acquired; and several authorities were cited in support of this principle. In the case referred to, supra, the stockholder was held liable for the tax of one per cent, upon the receipts, &c., of the company, before as well as after the act of February 15. But I do not controvert the principle contended for. Unquestionably if the company had acquired property or ehoses in action, or had conveyed property to others, as authorized by the law as it wag in force at the time, those acts could not be avoided or invalidated by a subsequent repeal or alteration of the charter. But suppose the Legislature should change the name of the company, which it undoubtedly has a right to do, such change could not divest the company of its right to the chose in action, or to enforce its collection. Yet it could not sue in its old name, which has now no existence. But it could sue for it and collect it in its new name. Hyatt v. McMahon, 25 Barb. R. 457. The obligation of the contract would continue, but the mode of enforcing it would be changed.
It is a well established principle of constitutional law, that a State may pass a law materially altering the remedy of one of the parties to a contract, although it cannot pass a law impairing the obligation thereof. Bank of Columbia v. Okeley, 4 Wheat. R. 235. In this case the obligation is to pay the debts to the corporation. That is in substance and effect the obligation of the contract. The debts belonged to the corporation, not to the president and directors at Alexandria. They, as stockholders, had an interest in them; and so had the president and directors of the branch at Pearisburg. But it was a debt due to this artificial person, who had an existence and personality in contemplation *482 of law. This ideal person had a corporate name, and could only sue or he sued in that name, unless otherwise authorized by law. Who would say that a law authorizing it to sue in another name, was not applicable to the remedy, but impaired the obligation of the contract.
We have seen that the Legislature may change the name of the corporation, and that, in such case, it must sue in its new name on contracts made in its old name. It has been hold that a statute of the State of Alabama, providing that promissory notes given to the cashier of a bank eo nomine, may be sued and collected in the name of the bank, is a law which affects the remedy only, and, although passed after the note was executed, does not impair the obligation of the contract. Crawford & al. v. Branch Bank of Alabama at Mobile, 7 How. U. S. R. 279. It seems to me, therefore, that an act of the Legislature, authorizing this corporation to sue for and collect these debts, in the name of the branch bank at Pearisburg, would apply only to the remedy, and could not impair the obligation of the contract. Authority to sue implies authority to receive, and to give acquittances and receipts in discharge of the debt.
Upon the whole, I am of opinion that the Legislature had the power to change the corporate name of the Bank of the Old Dominion, or to authorize it to sue and collect the debts due the corporation, contracted with the president and directors of the Old Dominion, at Alexandria, by the branch bank at Pearisburg; that such law does not impair the obligation of the contract, and is not in conflict with any provision of the constitution of the United States, or of the Confederate States, or of the State of Virginia; that the said branch bank was thereby invested with the same power to receive the debts, and to accept satisfaction in the currency which was receivable and *483 payable by all tbe other banks of the Commonwealth, -and which was in fact the only currency in circulation; and that the acceptance of such payment was as binding upon the corporation as if it had been done by the president and directors of the bank at Alexandria; ■and under the act of 8d of March, 1866, cannot now be disturbed or set aside. It is not so much a question •of agency as of legislative power, reserved in the ■charter, with the assent of the company and its stockholders.
The views which have been presented with diffidence in this opinion, are not confined to the points raised by the instructions moved in the Circuit court, but embrace the whole law of the case, as involved upon its merits, so far as shown by the record. In view of what has been said, without going into a critical examination of the political questions raised by the instructions moved by the plaintiff, I am of opinion that there is no error in the judgment of the Circuit court refusing to give them, or in the instruction which was given; and that the judgment should be affirmed.
Moncure, P., and Staples, J., concurred in the •opinion of Christian, J.
Joynes, J., concurred in reversing the judgments.
Judgments reversed.